## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

KATHLEEN MAREZ,                          )
                                         )
      Plaintiff,                         )
                                         )
vs.                                      )     **Case No. 4:09CV999MLM**
                                         )
SAINT-GOBAIN CONTAINERS, INC.,           )
                                         )
      Defendant.                         )

## MEMORANDUM OPINION

Before the court is the Motion for Summary Judgment filed by Defendant Saint-Gobain Containers, Inc. ("Defendant"). Doc. 53. Plaintiff Kathleen Marez ("Plaintiff") filed a Response. Doc. 67. Defendant filed a Reply. Doc. 70. Also before the court is Plaintiff's Motion to Strike Defendant's Exhibits A, D, E, SS, and TT. Doc. 76. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 7.

## LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

The court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn.

& E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Id. at 255; Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252. With these principles in mind, the court turns to an analysis of Defendant's motion.

## PLAINTIFF'S MOTION TO STRIKE

Plaintiff argues that the court should strike Defendant's Exhibits A, D, E, SS, and TT, which are affidavits filed in support of Defendant's Motion for Summary Judgment. Doc. 76. Plaintiff contends that the court should strike these affidavits because they are not signed before a notary and/or not dated. Defendant filed a Response to Plaintiff's Motion to Strike and, alternatively, asked the court for leave to refile the affidavits in question, which have been notarized and dated. Doc. 79.

The court finds that Defendant's request for leave to refile Exhibits A, D, E, SS, and TT should be granted. As such, the court finds that Plaintiff's Motion to Strike is moot.

## BACKGROUND and UNDISPUTED FACTS[1]

This court has previously dismissed **Count I** of the Second Amended Complaint in which Plaintiff alleged that Defendant retaliated against her in violation of the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.010. In **Count II** of the Second Amended Complaint, Plaintiff alleges that, on January 30, 2008, Defendant **discharged** her in violation of the **MHRA**, in that Plaintiff's **gender, female, was a contributing factor** to Defendant's discharging her. In **Count III**, Plaintiff alleges that Defendant violated the **MHRA**, in that Plaintiff's **age, forty-four, was a motivating factor in Defendant's discharging her** on January 30, 2008. In **Count IV**, Plaintiff alleges that Defendant violated the **Family and Medical Leave Act ("FMLA")**, 29 U.S.C. § § 2611, et seq., by its terminating her and docking her pay because she took leave under the FMLA in August and September 2007. In **Count V**, Plaintiff alleges that Defendant violated the **FMLA** by its terminating her on January 30, 2008 because she requested FMLA leave on January 28, 2008. Doc. 26. In the pending Motion for Summary Judgment, Defendant seeks summary judgment in its favor in regard to Counts II-V.

Defendant is a manufacturer of glass containers for the food and beverage industry. One of Defendant's plants is located in Pevely, Missouri. Defendant's Pevely plant operates multiple production lines, which include a hot end and a cold end. The Pevely plant operates twenty-four hours a day. Defendant's hourly employees are represented by the Glass, Molders, Pottery, Plastics

---

[1]        The facts are undisputed unless otherwise stated.

& Allied Workers International Union (the "Union"). With a small exception, to support Defendant's twenty-four hour operation, full-time day employees alternate between the day shift, the second shift, and the third shift, with a varying number of days off between shifts.

Plaintiff worked as a Shift Supervisor at the Pevely plant from the date of her hire, June 12, 2007, until she was terminated on January 30, 2008. Plaintiff's birth year is 1963 and, at the time she was hired, she was forty-two years old. Plaintiff's starting salary was $60,000.

While Plaintiff worked for Defendant, Charlie Franzoi was the Pevely Plant Manager, Scott Meade was the Operations Manager, Lisa Steiner was the Human Resources Manager, and Sandy Cook was the Cold End Manager. These persons supervised Plaintiff either directly or indirectly. Plant Manager Franzoi's date of birth is 1953; Operations Manager Meade's date of birth is 1967; Human Resources Manager Steiner's date of birth is 1959; and Cold End Manager Cook's date of birth is 1951. As such, all of these persons, with the exception of Operations Manager Meade, were older than Plaintiff. It is disputed who made the decision to hire Plaintiff. Defendant contends that Plant Manager Franzoi, Human Resources Manager Steiner, and Cold End Manager Cook made the decision to hire Plaintiff and Plaintiff contends that it was Jeff Rasnic, Production Manager, and Plant Manager Franzoi. The parties also dispute what the chain of command was at the Pevely plant at the time Plaintiff was employed there. Def. Facts, ¶¶ 11, 13; Pl. Resp. Def. Facts, ¶¶ 11, 13. At the time she was hired, Plaintiff said that she had over twenty years of previous supervisory experience, although she did not have previous glass making experience.

It is disputed whether Defendant had formal training for Shift Supervisors and disputed what the training for salaried employees was. Def. Facts, ¶ 16-17; Pl. Resp. Def. Facts, ¶¶ 16-17. The manner in which Plaintiff was trained by Defendant and the extent of this training is also disputed.

Def. Facts, ¶¶ 17-20; Pl. Resp. Def. Facts, ¶¶ 17-20. Whether Plaintiff received more training than any other shift supervisor and whether she complained that her training was inadequate are disputed. It is undisputed, however, that, as part of her training, Plaintiff shadowed Shawn Eggemeyer. Mr. Eggemeyer, whose birthday is 1971 and who started work for Defendant in 1994 as an hourly employee, became a Shift Supervisor in 2001. After Plaintiff's initial training, Plaintiff worked as a Shift Supervisor on the C Shift. Plaintiff's duties included: organizing and directing hourly employees in the hot end and the cold end; implementing process controls; maintaining administrative records to comply with job requirements and to ensure accurate record keeping; and providing regular training of employees. Defendant contends, and Plaintiff denies, that she was expected to follow Standard Operating Procedures ("SOPs"). It is also disputed what Defendant's SOPs were and whether Plaintiff received training on the SOPs.

During off-shifts, Plaintiff ran the entire plant. Defendant received a letter from the GMP Local President complaining about Plaintiff, although the date this letter was received is disputed. Def. Ex. L. Defendant contends that Plaintiff had the nickname "Marlboro woman," because she was rarely on the production floor and always in the women's restroom smoking. Plaintiff disputes this fact and contends that, although she was a chain smoker, she smoked on the production floor, as that was permitted. Def. Facts, ¶ 30; Pl. Resp. Def. Facts, ¶ 30. Defendant also contends that Cold End Manager Cook and Human Resources Manager Steiner were concerned that Plaintiff was more interested in becoming friends with hourly employees rather than supervising them, which fact Plaintiff denies. Def. Facts, ¶ 32; Pl. Resp. Def. Facts, ¶ 32.

On May 16, 2007, Human Resources Manager Steiner attended a meeting with Plaintiff, Cold End Manager Cook, Operations Manager Meade, and Plant Manager Fanzoi, during which meeting

they discussed the discipline of Faith Armor, an hourly employee on Plaintiff's shift. Plaintiff's conduct during that meeting is disputed. Defendant contends, and Plaintiff denies, that Plaintiff would not listen during the meeting and threw a stack of papers at Cold End Manager Cook. Plaintiff alleges, and Defendant denies, that during this meeting she complained that Ms. Armor was being treated differently than a male employee who did the same thing that Ms. Armor did. Def. Facts, ¶¶ 36, 40; Pl. Resp. Def. Facts, ¶¶ 36, 30. It is undisputed that, at no time during her employment, did Plaintiff complain of age discrimination.[2] On May 17, 2007, Plaintiff received a written warning based on the May 16, 2007 meeting.

Defendant asserts, and Plaintiff denies, that, in June 2007, Plaintiff asked for more experienced hot end personnel on the C Shift and that C Shift had been struggling with production numbers.

Defendant contends that Plaintiff was put on a Performance Improvement Plan ("PIP") and Plaintiff states that the first time she ever heard of this PIP was from Defendant's Statement of Undisputed Facts. The date Plaintiff was allegedly placed on the PIP is unclear.

On July 6, 2007, Plaintiff informed Human Resources Manager Steiner, by telephone, that she was suffering from a medical condition and that she would require a period of FMLA leave. Human Resources Manager Steiner advised Plaintiff that she was required to complete FMLA leave paperwork and told Plaintiff she had to call Cold End Manager Cook. It is disputed whether Human Resources Manager Steiner told Plaintiff that Cold End Manager Cook was going to "be pissed" that Plaintiff needed to take leave. Pl. Facts, ¶ 42. It is also disputed whether Human Resources Manager Steiner told Plaintiff that Plant Manager Franzoi was "furious" that she had to take FMLA leave. Pl.

---

[2]     As discussed above, the court has dismissed Count I, which alleged retaliation. However, complaints made by Plaintiff regarding gender or age discrimination are arguably relevant to whether Defendant discharged Plaintiff based on her gender and/or age.

Fact, ¶ 45. Plaintiff submitted FMLA paperwork on July 26, 2007, and Human Resources Manager Steiner, due to her title in Human Resources, certified Plaintiff's FMLA leave. This paperwork stated that Plaintiff required leave as of July 7, 2007, to undergo surgery and recovery. This paperwork did not state a definite return date, but stated that Plaintiff's surgery date was July 26, 2007, and that she had a probable return date from ten to fourteen days later. Mr. Steiner received documentation from Plaintiff which extended her FMLA leave until August 27, 2007. The date Defendant actually received this note from Plaintiff's doctor regarding the extension of her leave is disputed.

Plaintiff filed a short-term disability claim with Defendant's third party administrator, Disability Management Alternatives ("DMA"), which request was granted. Plaintiff did not return to work on August 27, 2007. Defendant contends that, although Plaintiff did not return to work on August 27, 2007, Defendant's payroll department thought Plaintiff had returned to work and began to pay her. Def. Fact, ¶ 56. Plaintiff denies this allegation and asserts, in response, that she received sixty percent of her salary under the short-term disability policy. She also denies that DMA suspended her short-term disability as of August 27, 2007. Pl. Resp. Def. Facts, ¶ ¶ 56, 60.

On September 7, 2007, Human Resources Manager Steiner sent Plaintiff a letter stating that she was terminated because she did not provide medical documentation to extend her FMLA leave and she had not returned to work as of August 27, 2007. On September 10, 2007, Defendant received additional documentation from Plaintiff's physician indicating that Plaintiff's leave was extended and that she was released to return to work on September 13, 2007. Human Resources Manager Steiner then reinstated Plaintiff's employment. Although it is disputed whether Plaintiff was paid her regular pay from August 27, 2007, to September 13, 2007, it is undisputed that, at least, she received an amount equal to short term disability pay during that period. It is undisputed that Plaintiff

was not entitled to receive her regular pay during that same period.

Defendant hired Jeff Terveer as a Shift Supervisor on July 9, 2007. He did not have previous glass making experience. Mr. Terveer's year of birth is 1971, and, as such, he is seven years younger than Plaintiff. His starting salary was approximately $55,000. On January 12, 2009, Cold End Manager Cook, Human Resources Manager Steiner, and the then current Plant Manager made the decision to terminate Terveer's employment with Defendant for unsatisfactory work performance.

After returning from FMLA leave, Plaintiff was moved to Shift Supervisor on B Shift. Operations Manager Meade and Cold End Manager Cook also placed Brian Hill, whose birth year is 1976, on B Shift. The reason Mr. Hill was placed on the B Shift is disputed. Mr. Hill began his employment with Defendant on June 2, 1991, as an hourly employee in the hot end and became a Shift Supervisor on May 1, 2007. It is disputed whether Plaintiff was told that she needed to run the B Shift more efficiently after Mr. Hill was reassigned at the end of October 2007.

Dave Boyer, whose birth year is 1971, was hired as an hourly employee by Defendant in 1997. Mr. Boyer became a Shift Supervisor on April 1, 2007, at a starting salary of $59,000. Danny Mahurin, whose birth year is 1962, was initially hired by Defendant as an hourly employee in 1981. Mr. Boyer became a Shift Supervisor in April 2007, at a salary of $59,000. Mr. Mahurin is one year older than Plaintiff and Mr. Boyer is seven years younger than Plaintiff. On November 9, 2007, Mr. Mahurin was issued a written warning for adjusting or turning off cold end inspection equipment. On December 8, 2008, Mr. Mahurin was issued a written warning for cursing, name-calling, and belittling hourly employees on his shift. On September 2, 2009, Mr. Mahurin was issued a seven day suspension for disrespectful conduct towards the hourly employees on his shift and running a carton machine when told not to. Since September 2, 2009, Mr. Mahurin's performance has improved.

On January 28, 2008, Mr. Terveer worked the day shift; Plaintiff worked the second shift; and Mr. Mahurin worked the third shift. During their shifts, they were required to fill out a SIM/TIM Channel Check Sheet. At the top of the Check Sheet, the Shift Supervisor places a check mark or an "X" in boxes to indicate that he/she has checked each shop, or production line, to ensure that the inspection equipment is working properly. The Shift Supervisor gathers this information by, among other things, looking at the SIL system, which is a computer system. It is disputed whether Shift Supervisors place an "X" to indicate that they checked the SIL system or whether they place an "X" to indicate that the machine was working properly. Def. Facts, ¶ 103; Pl. Resp. Def. Facts, ¶ 103. Plaintiff placed an "X" through certain boxes on the second shift's Check Sheet on January 28, 2008, and did not indicate any issues during her shift. It is disputed whether these marks indicated that she had checked the SIL system. Def. Facts, ¶ 106; Pl. Resp. Def. Facts, ¶ 106. A later review of the SIL system indicated that one of the quality-control pieces of equipment, the TIM, had "flat-lined" and was not communicating with the SIL system during Plaintiff's entire shift. Mr. Mahurin, the third shift supervisor, identified and recorded the flat-lined TIM on his Check Sheet and notified maintenance of this issue. Defendant asserts, and Plaintiff denies, that Operations Manager Mead, Cold End Manager Cook, Plant Manager Franzoi, and Human Resources Manager Steiner all believed that Plaintiff falsified the Check Sheet and, while reviewing the paperwork from January 28, 2008, they determined that there were other "discrepancies on [Plaintiff's] documentation during her shifts." Def. Facts, ¶ 118; Pl. Resp. Def. Facts, ¶ 118. Defendant contends, and Plaintiff denies, that Plaintiff did not follow SOPs on January 28, 2008, regarding a defect that was found in the cold end on a particular mold. Def. Facts, ¶¶ 120-23; Pl. Resp. Def. Facts, ¶¶ 120-23.

Plaintiff contends, and Defendant denies, that on January 28, 2008, Plaintiff informed Cold

End Manager Cook that she would be needing to take FMLA leave because Plaintiff's husband was going to have his toe amputated and that she would need this leave "soon." Plaintiff contends, and Defendant denies, that Cold End Manager Cook reacted angrily and was irritated when Plaintiff informed her of the need to take FMLA leave. Pl. Facts, ¶ 73. It is undisputed that Plaintiff did not file FMLA paperwork regarding her husband's toe amputation. January 28, 2008, was the last day Plaintiff worked for Defendant. Twelve days later Plaintiff's husband's toe was amputated.

A memo, dated January 30, 2008, from Operations Manager Mead and Cold End Manager Cook, states that data showed that on Plaintiff's Check Sheet, for January 28, 2008, she "recorded that [she] experienced no issues"; that "3 channels flat-lined from approximately 3 pm [on Plaintiffs January 28, 2008 shift] until the morning of 1/29/08"; that "3rd shift documentation show[ed] discovery of the issue and corrective actions were taken." The memo also states that "[i]n reviewing other paperwork, there [were] mulitple instances of [Plaintiff's] 'OK'-ing other found defects rather than following procedures." The memo then lists two such examples and further states that "I also believe you are falsifying quality documents by 'pencil whipping' your shift documents rather than actually rechecking and verifying acceptability." Def. Ex. HH.

On January 30, 2008, on which day Plaintiff was off, Cold End Manager Cook told Plaintiff to come in to work. Plaintiff was terminated on this date. Defendant contends that she was terminated for failing to follow SOPs by "pencil whipping" her documentation, falsifying documentation, and failing to improve her performance as a Shift Supervisor. Def. Resp. Pl. Facts, ¶ 78.

Also, Plaintiff contends that during the first week of her employment with Defendant, Plant Manager Franzoi told Plaintiff that Defendant had been trying to terminate employee Angie Stuart

for several years, but because she had a sexual relationship with a male Shift Supervisor, they could not fire Ms. Stuart.[3] Plaintiff alleges, and Defendant denies, that Plant Manager Franzoi told Plaintiff that if she could "get rid of" Ms. Stuart, he would move Plaintiff "to the top of the supervisor list." Plaintiff supervised Ms. Stuart and determined that Ms. Stewart should be terminated for insubordination. Ms. Stuart was fired. Plaintiff contends, and Defendant denies, that part of the reason Defendant hired her as a female supervisor was so that she could fire Ms. Stuart.

## COUNTS II and III
## GENDER AND AGE DISCRIMINATION UNDER THE MHRA

**A.    Legal Framework:**

In Counts II and III, respectively, Plaintiff alleges that Defendant violated the MHRA based on her gender and age. The MHRA prohibits discrimination in employment based on age and gender. See McCullough v. Real Foods, Inc., 140 F.3d 1123, 1126 (8th Cir. 1998); Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1107 (8th Cir. 1998); Midstate Oil Co. v. MCHR, 679 S.W.3d 842, 845-46 (Mo. 1984) (en banc). Because "Missouri's discrimination safeguards under the MHRA [] are not identical to the federal standards and can offer greater discrimination protection, ... 'federal caselaw which is contrary to the plain meaning of the MHRA is not binding.'" Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 818 (Mo. 2007) (en banc) (quoting and citing Brady v. Curators of Univ. of Mo., 213 S.W.3d 101, 112-13 (Mo. Ct. App. 2006) (discussing that MHRA & federal Title VII are "coextensive, but not identical, acts" and MHRA is "in some ways broader than Title VII, and in other ways is more restrictive")). Thus, "'[i]f the wording in the MHRA is clear and

---

[3]    In its Response to Plaintiff's additional statement of undisputed facts, Defendant repeatedly objects to Plaintiff's statement of facts on the grounds that they are hearsay or otherwise inadmissable. Such objections are inappropriate in response to a statement of undisputed facts; the issue for summary judgment is whether a particular fact is disputed.

unambiguous, then federal case law which is contrary to the plain meaning of the MHRA is not binding.'" Id. at 819 (quoting Brady, 213 S.W.3d at 113).[4]

To establish a prima facie case of gender or age discrimination in the workplace under the MHRA, an employee must satisfy four elements: (1) she was a member of a protected class; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated males. Buchheit, Inc. v. Missouri Commission on Human Rights, 215 S.W.3d 268, 277 (Mo. Ct. App. 2007). "The fourth element of a prima facie discrimination case also can be met if the employee provides 'some other evidence that would give rise to an inference of unlawful discrimination.'" Id. at 277 (citations omitted). Under the MHRA, "if consideration of age, disability, or other protected characteristics contributed to the unfair treatment, that is sufficient." Daugherty, 231 S.W.3d at 819 (citing McBryde v. Ritenour Sch. Dist., 207 S.W.3d 162, 170 (Mo. Ct. App. 2006)). As such, a protected characteristic need not be a "substantial or determining factor in an employment decision"; rather, it need be only a "contributing factor" in the employment decision. Id. "A 'contributing' factor has been defined as one 'that contributed a share in anything or has a part in producing the effect.'" Williams v. Trans States Airlines, Inc., 281 S.W.3d 854, 867 (Mo. Ct. App. 2009) (citing McBryde v. Ritenour Sch. Dist., 207 S.W.3d 162, 170 (Mo. Ct. App. 2006)).

"The ultimate question in every employment discrimination case involving a claim of disparate

_____

[4]     The court in Korando v. Mallinckrodt, Inc., 239 S.W.3d 647, 649 (Mo. Ct. App. 2007), held that the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), no longer applies to actions brought under the MHRA. "[T]he proper analysis for summary judgment cases under the MHRA applies the MAI 31.24 'contributing factor' standard." Id. (citing Daugherty, 231 S.W.3d at 820). Nonetheless, when analyzing an employment discrimination case under the MHRA, federal case law is still instructive when it is not contrary to the plain meaning of the MHRA. See Daugherty, 231 S.W.3d at 819-20.

treatment is whether the plaintiff was the victim of intentional discrimination." Palesch v. Missouri

Comm'n on Human Rights, 233 F.3d 560, 568-69 (8th Cir. 2000). In regard to disparate treatment:

> A plaintiff may prove allegations of disparate treatment by demonstrating that she was treated less favorably than similarly situated employees outside the plaintiff's protected class. See Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 259-60 (8th Cir.1996); Johnson v. Legal Servs. of Arkansas, Inc., 813 F.2d 893, 896 (8th Cir.1987). The test for whether employees are "similarly situated" to warrant a comparison to a plaintiff is a "rigorous" one. Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir.1994). For discriminatory discipline claims, "[e]mployees are similarly situated when they 'are involved in or accused of the same offense and are disciplined in different ways.'" Id.

Id.

Indeed, employment discrimination cases, such as the matter under consideration, often

depend on inferences rather than on direct evidence. Daugherty, 231 S.W.3d at 818. "Direct

evidence is that which shows a specific link between the alleged discriminatory animus and the

challenged decision, sufficient to support a finding that an illegitimate criterion actually motivated the

employment decision." Id. at 818 n.4 (citing Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66

(8th Cir. 1997)).

Applying the "contributing factor" standard of the MHRA at the summary judgment stage,

plaintiff must show that there is "a genuine issue of material fact as to whether" age or gender was

a "contributing factor in [Defendant's] termination decision." Id. at 820.[5] A court considering a

---

[5] As stated by the court in Daugherty, 213 S.W.3d at 820, MAI 31.24 (6th Ed. Supp. 2007) provides what a plaintiff must establish at trial to prevail on a claim of employment discrimination. MAI 31.24 states:

Your verdict must be for plaintiff if you believe:

First, defendant (here insert the alleged discriminatory act, such as "failed to hire," "discharged" or other act within the scope of Section 213.055, RSMo) plaintiff, and

motion for summary judgment, where a violation of the MHRA has been alleged, must determine whether the "record shows two plausible, but contradictory, accounts of the essential facts and the 'genuine issue' in the case is real, not merely argumentative, imaginary, or frivolous." Id. at 820. A claim of discrimination under the MHRA "will survive a motion for summary judgment if there is a genuine issue of material fact as to whether [the plaintiff's gender or age] was a 'contributing factor' in [her] [e]mployer's termination decision." Korando, 239 S.W.3d at 650 (citing Daugherty, 231 S.W.3d at 820).

## A.      Count II - Gender Discrimination:

As a female, Plaintiff is in a protected group and she suffered an adverse employment action, as she was discharged in January 2008. To survive the pending Motion for Summary Judgment, Plaintiff must additionally establish both that she was qualified to perform her job and that she was treated differently from similarly situated males. See Buchheit, 215 S.W.3d at 277. Indeed, it is disputed whether Plaintiff was qualified to perform her job or whether she was meeting employment expectations. While there is no direct evidence that Plaintiff's gender played a role in her termination, there are genuine issues of material fact in regard to whether Plaintiff's gender was a contributing factor in Defendant's decision to discharge Plaintiff. See id. These facts include, but are not limited to, whether similarly situated men were disciplined and/or discharged for violation of Defendant's

---

Second, (here insert one or more of the protected classifications supported by the evidence such as race, color, religion, national origin, sex, ancestry, age, or disability) was a contributing factor in such (here, repeat alleged discriminatory act, such as "failure to hire," "discharge," etc.), and

Third, as a direct result of such conduct, plaintiff sustained damage.
*[unless you believe plaintiff is not entitled to recover by reason of Instruction Number __ (here insert number of affirmative defense instruction) ].

SOPs.  The court finds, therefore, that Plaintiff has met her burden to withstand Defendant's Motion for Summary Judgment as to Plaintiff's allegation, in Count II, that she was discharged in January 2008, based on her gender. See Celotex, 477 U.S. at 322; Daugherty, 231 S.W.3d at 818.  As such, the court will deny Defendant's Motion for Summary Judgment as to Count II of the Second Amended Complaint.

**B.      Count III - Age Discrimination:**

Plaintiff was in the protected age group and she suffered an adverse employment action when she was discharged in January 2008.  Plaintiff has presented no direct or indirect evidence to suggest that her age played any role in the decision to terminate her.   Assuming, arguendo, that Plaintiff was qualified to perform her job, she has not established that similarly situated younger persons were treated differently. See Buchheit, 215 S.W.3d at 277.  The younger persons, whom Plaintiff alleges were similarly situated to her and whom she alleges were not terminated, were not sufficiently younger than Plaintiff to suggest an unlawful motive on the part of Defendant. See Ramlet v. E.F. Johnson Co., 507 F.3d 1149, 1154 (8th Cir. 2007) (holding that even a five-year difference is not sufficient to permit an inference of age discrimination); Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1136 (8th Cir. 2006) (holding that to establish a prima facie case of age discrimination a plaintiff must have been replaced by someone "substantially younger").   Therefore, Defendant's failure to terminate persons younger than Plaintiff does not suggest that Plaintiff's age was a contributing factor or that it played any role in Defendant's decision to terminate her.  As such, the court finds that there is no genuine issue of material fact in regard to Plaintiff's claim of age discrimination under the MHRA.  The court further finds that summary judgment should be granted in Defendant's favor in regard to Count III of the Second Amended Complaint. See Palesch, 233 F.3d

at 568; <u>Daugherty</u>, 213 S.W.3d at 820.

## DISCHARGE BASED ON THE FMLA

**B.     Legal Framework:**

Plaintiff alleges in her Second Amended Complaint, Counts IV and V, that Defendant

terminated her because she requested and took FMLA leave in 2007 and because she requested leave

again in 2008.  The FMLA, 29 U.S.C. § 2612(a)(1)(C) provides that an employee is entitled to a total

of twelve workweeks of leave during any twelve-month period to care for a spouse, if the spouse has

a serious health condition.  Section 2612(a)(1)(D) provides for such leave where the employee has

"a serious health condition that makes the employee unable to perform the functions of the position

of such employee." <u>See</u> <u>Krohn v. Forsting</u>, 11 F.Supp.2d 1082, 1089 (E.D. Mo. 1998).   The

analytical framework of <u>McDonnell Douglas</u>, 411 U.S. at 800-06, has been applied to claims of

discriminatory discharge under the FMLA. <u>Id.</u> at 1093 (citing <u>Hodgens</u>, 144 F.3d 151, 159 (1st Cir.

1998);  <u>Diaz v. Fort Wayne Foundry Corp.</u>, 131 F.3d 711, 712-13 (7th Cir.1997); <u>Morgan v. Hilti,</u>

<u>Inc.</u>, 108 F.3d 1319, 1323 (10th Cir.1997)).

As stated by the court in <u>Krohn</u>, the three-part <u>McDonnell Douglas</u> analysis is applicable in

an FMLA case and, as such:

> A [FMLA] plaintiff has the initial burden of establishing by a preponderance
> of the evidence a prima facie case of discrimination. Only upon this prima
> facie showing does the burden of production shift to the employer to
> articulate some legitimate, nondiscriminatory reason for the employment
> action at issue. If the employer carries this burden of production, the burden
> shifts back to the employee to demonstrate that the proffered reason is mere
> pretext for discrimination.

11 F.Supp. 2d at 1093-94 (citing <u>Ledergerber v. Stangler</u>, 122 F.3d 1142, 1144 (8th Cir. 1997)

(applying <u>McDonnell Douglas</u> analysis in a Title VII case).

As further stated by the court in <u>Krohn</u>, 11 F. Supp. 2d at 1093-94:

> When the prima facie case has been successfully rebutted, the presumption of discrimination disappears. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 510-11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ... . The burden then shifts back to the plaintiff to present evidence sufficient to support two findings. First, the plaintiff must present evidence which creates a fact issue as to whether the employer's proffered reasons are mere pretext. Second, she must present evidence which creates a reasonable inference that the adverse employment decision was taken against her for having sought protected FMLA leave. <u>See</u> <u>McCullough v. Real Foods, Inc.</u>, 140 F.3d 1123, 1127 (8th Cir. 1998) (holding in a Title VII race discrimination case that a plaintiff must present evidence which creates a reasonable inference that the adverse employment decision was an act of intentional racial discrimination).

Most recently, the Eighth Circuit has explained, in regard to establishing a cause of action

under the FMLA as follows:

> There are two types of claims under the FMLA: interference and retaliation. <u>Phillips v. Mathews</u>, 547 F.3d 905, 909 (8th Cir. 2008). ... [A] claim of "interference," [] occurs when an employer's action deters or attaches negative consequences to an employee's exercise of FMLA rights.[6] <u>See</u> 29 U.S.C. § 2615(a)(1) (it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA); <u>Stallings v. Hussmann Corp.</u>, 447 F.3d 1041, 1050 (8th Cir. 2006).

> "This court has recognized that an employee can prove interference with an FMLA right regardless of the employer's intent." <u>Stallings</u>, 447 F.3d at 1050. However, the FMLA is not a strict-liability statute. <u>Throneberry v. McGehee Desha County Hosp.</u>, 403 F.3d 972, 977 (8th Cir. 2005). An employee who requests FMLA leave has no greater protection against termination for reasons unrelated to the FMLA than she did before taking the leave. <u>See</u> <u>id.</u> [] [A]n employee "cannot claim protection from the FMLA for disciplinary action ... as a result of absences that are not attributable to [her] serious health conditions[.]" ... <u>Bailey v. Amsted Indus. Inc.</u>, 172 F.3d 1041, 1045-46 (8th Cir.1999). Therefore, an employer who "interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights." <u>Throneberry</u>, 403 F.3d at 977.

---

[6]     Interference under the FMLA has also been described as an employer's denying or interfering with an employee's substantive rights under the FMLA. <u>Phillips v. Mathews</u>, 547 F.3d 905, 909 (8th Cir. 2008). Retaliation under the FMLA has been described as a situation where an employer discriminated against an employee for exercising FMLA rights. <u>Id.</u>

Estrada v. Cypress Semiconductor (Minnesota) Inc., __ F.3d __, 2010 WL 3220363, at *4 (8th Cir. Aug. 17, 2010).

Indeed, "'every discharge of an employee while she is taking FMLA leave interferes with an employee's FMLA rights.'" Phillips v. Mathews, 547 F.3d 905, 909 (8th Cir. 2008) (quoting Throneberry v. McGehee Desha County Hosp., 403 F.3d 972, 980 (8th Cir. 2005)). An employer is not liable for such interference, however, "where an employee's reason for dismissal is insufficiently related to FMLA leave." Id. (citing Stallings v. Hussmann Corp., 447 F.3d 1041, 1051 (8th Cir. 2006). An employer bears the burden to prove that the reason for its terminating an employee who is on FMLA leave was unrelated to FMLA. Id.

B.    **Discussion:**

Pursuant to the first step in a McDonnell Douglas analysis, the court will consider whether Plaintiff has established a prima facie case of a violation of the FMLA. In regard to Plaintiff's 2007 FMLA leave, the undisputed facts establish that Defendant terminated Plaintiff because she did not return to work on August 27, 2007, the date her doctor released her to return to work. See Krohn, 11 F.Supp. 2d at 1091 ("[W]here an employer requests and receives from the employee a physician's certification that the employee's serious health condition does not prevent him from performing the functions of his job, the employer may rely on that certification until the employee provides a contradictory medical condition."). Upon receiving certification from Plaintiff's doctor that she would not be released to return to work until September 13, 2007, Defendant reinstated Plaintiff. Plaintiff received, at least, short term disability pay until she returned to work. Plaintiff cites no authority for her assertion that Defendant violated the FMLA because it allegedly required her to pay back overpayment of wages she received, due to an accounting error, for the period she was on

18

FMLA leave in August and September 2007. To the extent Defendant arguably terminated Plaintiff while she was on FMLA leave in August and September 2007 and docked her pay during this period, it was a mistake on Defendant's part, which mistake Defendant acknowledged and corrected. Defendant, therefore, has met its burden to show that it terminated Plaintiff in August/September 2007 for a reason which did not violate Plaintiff's FMLA rights. See Phillips, 547 F.3d at 909. Additionally, the court finds that Plaintiff has failed to establish a prima facie case in this regard. See Krohn, 11 F.Supp. 2d at 1093-94. As such, the court finds that summary judgment should be granted in Defendant's favor in regard to Count IV of the Second Amended Complaint.

On the other hand, the court finds that there are genuine issues of material fact as to whether Plaintiff was discharged in January 2008 because she informed Defendant that she was going to take FMLA leave. These genuine issues of material fact include, but are not limited to, whether Plaintiff told Cold End Manager Cook, on January 28, 2008, that she would be needing to take FMLA leave to take care of her husband. To the extent Defendant argues that Plaintiff never completed the paperwork for FMLA leave, she did not have an opportunity to do so. Significantly, Plaintiff was discharged only two days after she allegedly informed Defendant that she would need to take FMLA leave and before the need to take such leave actually arose. As such, the court finds that Defendant's Motion for Summary Judgment should be denied as to Count V, alleging that Plaintiff was discharged in January 2008 in violation of the FMLA.

## CONCLUSION

For the reasons articulated above, the court finds that there are genuine issues of material fact in regard to whether Defendant discharged Plaintiff, in January 2008, based on her gender and in violation of the FMLA. The court further finds that the undisputed facts fail to establish a prima facie

case that Defendant discharged Plaintiff based on her age. Additionally, the undisputed facts fail to establish a prima facie case that Defendant terminated Plaintiff and docked Plaintiff's pay, in August or September 2007, in violation of the FMLA. As such, the court will grant Defendant's Motion for Summary Judgment in regard to Counts III and IV of the Second Amended Complaint and will deny it in regard to Counts II and V.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Defendant is **GRANTED**, in part, and **DENIED**, in part; Doc. 53

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** as to Counts III and IV;

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment is **DENIED**, as to Counts II and V;

**IT IS FURTHER ORDERED** that Defendant's alternative Motion for Leave to File amended exhibits is **GRANTED**; Doc. 79

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Defendant's Exhibits A, D, E, SS, and TT is **DENIED**, as moot. Doc. 76.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE


Dated this 13th day of September, 2010.