UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KATHLEEN MAREZ,                          )
                                         )
        Plaintiff,                       )
                                         )
    vs.                                  )        Case No. 4:09CV999MLM
                                         )
SAINT-GOBAIN CONTAINERS, INC.,           )
                                         )
        Defendant.                       )

## MEMORANDUM OPINION AND ORDER

This matter is before the court on various post-trial Motions filed by the parties.

## I.    BACKGROUND

Plaintiff filed a Second Amended Complaint (Doc. 26) alleging (I) unlawful retaliation in violation of the Missouri Human Rights Act (MHRA); (II) discriminatory discharge in violation of the MHRA (gender); (III) discriminatory discharge in violation of the MHRA (age); (IV) unlawful discharge in violation of the Family and Medical Leave Act (FMLA) in 2007; and (V) unlawful discharge in violation of the FMLA in 2008.

Defendant moved to dismiss Counts I, II and III (Docs. 30, 31). The court issued a Memorandum Opinion dismissing Count I[1] and denying the Motion to Dismiss as to Counts II and III. [Doc. 42]

---

[1] Count I was dismissed because plaintiff's EEOC charge was filed more than 180 days after the retaliatory conduct. See MHRA, Mo.Rev.Stat. at §213.075.

Prior to trial, defendants moved for summary judgment on all of plaintiff's claims. (Docs. 53, 54) The court granted summary judgment on Count III (age discrimination) and Count IV (the 2007 FMLA retaliation claim.) Plaintiff's remaining claims - gender discrimination and the 2008 FMLA retaliation claim - proceeded to trial in January, 2011. The jury found in favor of defendant on plaintiff's gender discrimination claim and found in favor of plaintiff on the 2008 FMLA retaliation claim. The jury awarded plaintiff $206,500 in damages. The court entered judgment in the amount of $206,500 and an additional $206,500 in liquidated damages.

## II. DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW [DOC. 132]; PLAINTIFF OPPOSED THE MOTION [DOC. 150]; DEFENDANT REPLIED [DOC. 153]

In this Motion defendant moves the court for Judgment as a Matter of Law on Plaintiff's 2008 FMLA retaliation claim.[2] Defendant argues it is entitled to judgment as a matter of law because plaintiff gave the jury no legally sufficient evidentiary basis upon which to find for her on her 2008 FMLA claim. In addition, defendant argues that the issue of liquidated damages should not have been submitted to the

---

[2] Written opinions are issued as a matter of course on motions for judgment as a matter of law that are renewed after trial pursuant to Rule 50(b). It is not standard practice in this district to issue such written opinions during trial. To the extent defendant complains of the court's failure to do so, the complaint is noted.

jury by asking on the verdict form whether the defendant acted in good faith when defendant terminated plaintiff.[3]

## A.     Applicable Law Concerning Judgment as a Matter of Law

Pursuant to Rule 50 of the Federal Rules of Civil Procedure, Judgment as a Matter of Law ("JAML") should not be granted unless "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). In applying this standard, a court must "draw all reasonable inferences in favor of the non-moving party without making credibility assessments or weighing the evidence." Arabian Agriculture Services Co. v. Chief Industries, Inc., 309 F.3d 479, 482 (8th Cir. 2002) (quoting Phillips v. Collings, 256 F.3d 843, 847 (8th Cir. 2001)). A court should grant judgment as a matter of law "only when all of the evidence points one way and is 'susceptible of no reasonable inference sustaining the position of the moving party.'" Kinserlow v. CMI Corp., 217 F.3d 1021, 1025 (8th Cir. 2000) (quoting Smith v. World Ins. Co., 38 F.3d 1456, 1460 (8th Cir. 1994) and White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992)). The court's review of the jury's verdict is extremely deferential and the court cannot grant the Motion unless, after reviewing the evidence in the light most favorable to the verdict, the court concludes that no reasonable jury could have returned a verdict for the non-moving party. Morse v.

---

[3]     Defendant filed a **Supplemental Submission in Opposition to an Award of Liquidated Damages.** [Doc. 124]

Southern Union Company, 174 F.3d 917, 922 (8th Cir. 1999); Denesha v. Farmers Ins. Exchange, 161 F.3d 491, 497 (8th Cir. 1998).

In considering defendant Saint-Gobain's Motion for Judgment as a Matter of Law, this court must: (1) consider the evidence in the light most favorable to plaintiff; (2) assume all conflicts in the evidence will resolve in plaintiff's favor; (3) assume plaintiff proved all facts that her evidence tended to prove; and (4) give plaintiff the benefit of all favorable inferences that may reasonably be drawn from the proven facts. See Morse, 174 F.3d at 922; Denesha, 161 F.3d at 497. In order to prevail on its Motion for Judgment as a Matter of Law defendant Saint-Gobain "has the difficult task of demonstrating that all of the evidence points in [its] direction and is susceptible of no reasonable interpretation sustaining [plaintiff's] position." Morse, 173 F.3d at 922.

B.     Discussion

At trial plaintiff had the burden of proving each element of her FMLA retaliation claim such that a reasonable jury could find in her favor on that claim. Defendant argues that plaintiff failed to present any evidence that her FMLA notification was the determining factor, or the "but for" cause, of her termination. Plaintiff argues that a reasonable jury of eight persons unanimously did find that the evidence showed that plaintiff was terminated for informing her supervisor of her need to take FMLA leave and that defendant should have known that such termination would reasonably violate the FMLA.

In order to prove an FMLA retaliation claim, a plaintiff must prove that (a) she requested FMLA leave or notified her employer of her need to take FMLA leave and (b) that the request/notification was the determining factor, or the "but for" cause, of her termination. Hite v. Vermeer Mfg. Co., 361 F.Supp. 2d 935, 942 (S.D. Iowa 2005). Plaintiff's only evidence that she requested FMLA leave or notified her employer of her need to take FMLA leave is that she testified she told Sandy Cook that she would need to take leave "soon" because her husband was going to have his toe amputated. Sandy Cook denied that this occurred. Applying the standard set out above and viewing the evidence in the light most favorable to the verdict, the court must assume conflicts in the evidence are resolved in plaintiff's favor. Therefore, assuming plaintiff told Sandy Cook of her need to take FMLA leave, the evidence presented was undisputed that none of the other three decisionmakers was aware of it. Lisa Steiner, Scott Meade and Charlie Franzoi all testified they did not know plaintiff had requested FMLA leave at the time they made the termination decision. However, again viewing the evidence in the light most favorable to the verdict, the jury may not have believed their testimony.[4] Plaintiff admitted she did not complete any paperwork or take any other formal steps usually required by Saint-Gobain for an individual to request FMLA leave.

---

[4]    Credibility determinations are not to be considered in deciding a Motion for Judgment as a Matter of Law. Kramer v. Logan County School District No. R-1, 157 F.3d 620, 624 (8th Cir. 1998), (citing Triton Corp. v. Hardrives, Inc., 85 F.3d 343, 345) ("We will not weigh, evaluate, or consider the credibility of the evidence.")

Plaintiff's theory was that as soon as Sandy Cook learned of the FMLA request, she went on a "witch hunt," hurried to gather paperwork that would support plaintiff's termination and hastily called together the other decisionmakers because Sandy Cook was "out to get her" or at the very least, looking for a reason to fire her. There is no question that plaintiff presented evidence that could be construed as her "having history" with Sandy Cook: Plaintiff described a litany of incidents in which she and Sandy Cook were at odds including: she testified that when she asked Sandy Cook for more training, Ms. Cook told her to go to someone else; she testified she was written up for insubordination for complaining that Sandy Cook disciplined a female employee for actions for which male employees were not disciplined and allegations that she aggressively threw papers across a table at Sandy Cook; she testified that prior to plaintiff's FMLA leave in 2007, Sandy Cook told her "you better be on your death bed if you are going to miss work;" that in 2007 plaintiff took FMLA leave after emergency surgery and Sandy Cook showed hostility towards her for taking that leave and asked her if she could come in regardless; that Lisa Steiner prematurely terminated plaintiff in 2007 while she was still out on FMLA leave and re-hired her when she realized should could have been legally liable for violating the FMLA leave policy; and that on January 28, 2008 plaintiff notified Sandy Cook that she would be needing to take FMLA leave "soon" for her husband's toe amputation. She was scheduled to be off work the following two days and in that time period when plaintiff was off work, Sandy Cook looked for any and every reason to get her

terminated and printed out all her findings to be presented to the other decisionmakers who called her in after only a day and a half.

While temporal proximity alone is rarely sufficient to demonstrate causation, the timing of the termination just one and a half days after she told Sandy Cook she would need FMLA leave together with the fact that the other decisionmakers only reviewed documents shown them by Sandy Cook could certainly be seen as sufficient to around the jury's suspicion.  See, Bradley v. Widnall, 232 F.3d 626, 633 (8th Cir., 2000) (a plaintiff "must do more than point to the temporal connection between the filing of her first complaint and the [employer's] allegedly adverse actions.")

Plaintiff was told she was being terminated for failing to check off that a piece of inspection equipment was not reporting, that she was not following procedures and that she was allegedly "pencil-whipping" her documents.  Plaintiff produced evidence that other production supervisors were similarly shown to have failed to check off that the same inspection equipment was not reporting and were not similarly terminated; that other production supervisors were similarly shown to have failed to follow procedures and were not similarly terminated; and that other production supervisors were similarly shown to have quickly filled out documents, leaving things blank, and/or not filled out correctly and were not similarly terminated.  While this latter evidence was introduced primarily for plaintiff's gender claim, clearly it has relevance to the instant discussion because it is plaintiff's position that the only difference between her conduct and that of the other production supervisors is that she requested FMLA leave and they did not.

Because each of the other three decisionmakers testified they did not know of plaintiff's FMLA request and that they made an independent evaluation of the records presented by Sandy Cook and decided to terminate plaintiff, defendant argues that there is therefore no causal "but for" connection between the termination and the FMLA request.

Plaintiff, to the contrary, argues that the "cat's paw" theory applies to this case.[5] "In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decision making power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Qamhiyah v. Ohio State Univ. of Science & Technology, 566 F.3d 733, 742 (8th Cir. 2009), (quoting EEOC v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 484 (10th Cir. 2006). Pursuant to this theory, the Eighth Circuit has stated that "An employer can be liable, under certain circumstances, where the formal decisionmaker is not the person who harbored an unlawful motive to terminate the employee." Qamhiyah, 566 F.3d at 472 (quoting Dedmon v. Staley, 315 F.3d 948, 949 n. 2 (8th Cir. 2003)).

---

[5]    "The 'cat's paw' doctrine derives its name from a fable, made famous by la Fontaine in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire. See Fables of La Fontaine, 344 (Walter Thornbury trans., Chartwell Books 1984). As the cat scoops the chestnuts from the fire one-by-one, burning his paw in the process, the monkey eagerly gobbles them up leaving none for the cat. Id. Today the term 'cat's paw' refers to 'one used by another to accomplish his purposes.' Webster's Third New International Dictionary Unabridged, 354 (2002)." EEOC v. BCI Coca-Cola Bottling Company of L.A., 450 F.3d 476, 484 (10th Cir. 2006).

This circuit's "cat's paw" rule provides that an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design.

Qamhiyah, 566 F.3d at 472 (quoting Richardson v. Sugg, 448 F.3d 1046, 1060 (8th Cir. 2006)).

Although the Eighth Circuit has yet to define the level of control biased subordinates must exert over decisionmakers before attributing liability to employers, they have given lower courts a method of analysis for resolving the issue. The Eighth Circuit applies its prior "cat's paw" case law to resolve the rule's application. See Qamhiyah, 566 F.3d at 743 - 745 summarizing the cases analyzed: Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316 (8th Cir. 1994) (employer liable when facts relied upon by decisionmakers have been filtered by a manager determined to purge the labor force of women); Lacks v. Ferguson Reorganized School District R-2, 147 F.3d 718 (8th Cir. 1998) (teacher's claim of race discrimination failed because the decision to terminate her was made by the school board and there was no evidence that the school board deferred to the opinions of the biased principal or superintendent in making the determination); Kramer v. Logan County School District No. R-1, 157 F.3d 620 (8th Cir. 1998) (where biased principal and superintendent initiated the actions that led to the school board's review and non-renewal of teacher's contract, it was not unreasonable for the jury to find her non-renewal was the result of intentional gender discrimination); Dedmon v. Staley, 315 F.3d 948 (8th Cir. 2003) (insufficient evidence to support

proffered "cat's paw" instruction where there was no evidence that immediate supervisor had unlawful motive or initiated, exercised or even possessed any influence or leverage over county clerk's decision to fire the employee); <u>Richardson v. Sugg</u>, 448 F.3d 1046 (8th Cir. 2006) (university president was not "cat's paw" for biased athletic director where coach's contract provided the university president to independently review any decision to terminate coach, the president conducted the review and independently determined there was insufficient basis to follow the coach); finally, <u>Qamhiyah v. Iowa State Univ. of Science and Technology</u>, 566 F.3d at 745. (the case that sets out the applicable method of analysis, held there was simply no evidence that the Board of Regents that did an independent review served as the conduit, vehicle, or rubber stamp by which another achieved his or her unlawful design).

As can be seen, while the method of analysis is clear, the cases provide divided guidance. However, <u>Kramer</u>, 157 F.3d 620 is particularly instructive. In <u>Kramer</u>, the plaintiff's theory was that the biased principal and superintendent initiated the non-renewal of plaintiff's contract and made material misrepresentations and omissions to the school board in presenting their recommendation and thus the school district was held liable. Kramer offered evidence of her competency and showed the principal and superintendent's disparate treatment of female teachers, and argued it sufficiently undermined the legitimate non-discriminatory reasons offered by the school board. The court held that:

> Assuming the facts as alleged by Kramer were proven, giving her the
> benefit of all reasonable inferences, and resolving all conflicts in the

> evidence in her favor, we cannot say that it was unreasonable for the jury to conclude that the non-renewal of her full-time teacher's contract was the result of intentional gender discrimination.

Kramer, 157 F.3d at 624-25.

The same is true in the instant case. As soon as plaintiff told Sandy Cook she was going to need FMLA leave "soon," Sandy Cook gathered the damaging documents and initiated the meeting of the decisionmakers. All three (Scott Meade, Lisa Stein and Charlie Franzoi) testified they only reviewed the documents shown to them by Sandy Cook and did not conduct an independent investigation. Sandy Cook did not tell them that Dave Boyer, Jeff Terveer, Brian Hill and Danny Mahurin were guilty of essentially the same conduct for which she was recommending plaintiff's termination and for which she had not similarly recommended their termination. Assuming the facts as alleged by plaintiff were proven, giving her the benefit of all reasonable inferences, and resolving all conflicts in her favor, the court cannot say it was unreasonable for the eight person jury to conclude that plaintiff's termination was the "but for" result of her notification to Sandy Cook of her need to take FMLA leave.

The court finds that the "cat's paw" theory does apply in this case and therefore defendant's Renewed Motion for Judgment as a Matter of Law will be denied.

## C. Applicable Law Concerning Liquidated Damages

The FMLA states that an employer who violates the FMLA shall be liable to an eligible employee for damages equal to - -

(i)      the amount of - -
       (1)      any wages, salary, employment benefits, or other
compensation denied or lost to such employee by reason of the
violation;
       . . .
(ii)     the interest on the amount described in clause (i) calculated at
the prevailing rate; and
(iii)    an additional amount as liquidated damages equal to the sum of
the amount described in clause (i) and the interest described in clause
(ii), except that if an employer who has violated section 2615 of this title
proves to the satisfaction of the court that the act or admission which
violated section 2615 of this title was in good faith and that the
employer had reasonable grounds for believing that the act or
admission was not a violation of section 2615 of this title, such court
may, in the discretion of the court, reduce the amount of the liability to
the amount and interest determined under clauses (i) and (ii),
respectively. . . .

29 U.S.C. § 2617

"Liquidated damages are considered compensatory rather than punitive in nature." Thorson v. Geminin, Inc., 96 F. Supp. 2d 882, 890-91 (8th Cir. 1999). "Doubling damages is not some disfavored penalty. Although they are discretionary rather than mandatory, there is a strong presumption in favor of doubling, a presumption only overcome only by the employer's good faith and reasonable grounds for believing that the act or omission was not a violation of the Act." Id. at 891. "Neither the FMLA nor the implementing regulations establish parameters by which to assess the validity of a stated 'good faith' defense." Morris v. VCW, Inc., 1996 WL 740544 at *2 (W.D. Mo.).

D.    Discussion

Plaintiff argues that when she asked for FMLA leave in 2007, Lisa Steiner (defendant's Human Resources Manager) acted prematurely and terminated plaintiff

while she was still on FMLA leave. Plaintiff says that upon realizing this error, Saint-Gobain "reluctantly" rehired her, and that Lisa Steiner sounded irritated. Plaintiff testified that when she asked for FMLA leave in 2008 for her husband's toe amputation, Sandy Cook sounded irritated and at that point, went on her "witch hunt."

Defendant, on the other hand, argues that Saint-Gobain's rehiring plaintiff in 2007, when it learned of its error, is solid evidence that Saint-Gobain was concerned about the implications of not following the law and took steps immediately to act in conformity with it. Lisa Steiner testified that she herself had taken FMLA leave with no problems and Saint-Gobain put on evidence of its ethics policy and its EEO policy showing its regard for the law.

The court agrees with defendant that this is a somewhat unique case in that there was no formal denial of FMLA leave or termination of plaintiff while she was on FMLA leave in 2008. The disputed issue is whether plaintiff told Sandy Cook she would need leave. Therefore, the case is not susceptible to a "traditional" good faith analysis. In any case however, the defendant bears the burden of establishing that it acted with subjective good faith and that it had an objectively reasonable belief that its conduct did not violate the law. Hite v. Vermeer Mfg. Co., 446 F.3d 858, 868 (8th Cir. 2006). Because of this, and because the statute states that the court should make the decision, the court asked the jury on the verdict form for their opinion on whether Saint-Gobain acted in good faith. The jury answered in the negative. See Murphy v. FedEx Nat. LTL, Inc., 2009 WL 1939957 at *1 (E.D.Mo.)("the jury also

found that Defendant had not acted in good faith when it denied Plaintiff FMLA benefits and terminated her employment. . .") (emphasis added).

However, even if the employer did act in good faith "the decision to award liquidated damages is still within the discretion of the trial court." Hite, 446 F.3d at 686, (quoting Nero v. Indus. Molding Corp., 167 F.3d 921, 928 (5th Cir. 1999)). "The district court should exercise its discretion 'consistently with the strong presumption under the statute in favor of doubling.'" Hite, 446 F.3d at 868-69, (quoting Shea v. Galaxie Lumber & Constr. Co., Ltd., 152 F.3d 729, 733 (7th Cir. 1998)). "When a district court submits a claim to an advisory jury, the court is free to accept or reject the jury's advisory verdict in making its own findings." Harris v. Secy. U.S. Department of Army, 119 F.3d 1313, 1320 (8th Cir. 1997). Here, the court has reviewed the trial testimony and the arguments of the parties and has taken into consideration the advice of the jury. Showing good faith when a jury has determined intentional retaliation is a very high bar to clear, Hite, 446 F.3d at 869, and thus reviewing the evidence in the light most favorable to the verdict, the court finds that it is not unreasonable to award liquidated damages.[6]

III.  **PLAINTIFF'S MOTION FOR PREJUDGMENT INTEREST AND REINSTATEMENT OR IN THE ALTERNATIVE, FRONT PAY [Doc. 135]; DEFENDANT RESPONDED IN OPPOSITION [Doc. 138]; PLAINTIFF REPLIED [Doc. 152]**

---

[6]  Liquidated damages are calculated not only on wages, salary, employment benefits or other compensation denied to plaintiff because of the retaliation but on the interest at the prevailing rate on such damages as well. Therefore the Judgment previously entered will be amended.

## A. Applicable Law Concerning Prejudgment Interest

28 U.S.C. § 2617 provides that an employer who violates the FMLA is liable for damages in the amount of any wages, salary, employment benefits or other compensation plus interest thereon "calculated at the prevailing rate." 28 U.S.C. § 2617(a)(1)(A)(ii). ". . .The Eighth Circuit calculates both prejudgment and post judgment interest at the rate specified in 28 U.S.C. § 1961." EEOC v. Dooley, 2008 WL 631175 (D.S.D.) (citing Novak v. Mackintosh, 937 F.Supp. 873, 883 (D.S.D. 1996)) (citing Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1331 (8th Cir. 1995)). The court acknowledges that there are cases approving alternate calculations, however finds the above-cited authority more persuasive.

Regarding post-judgment interest, 28 U.S.C. § 1961 provides:

> a.    Interest shall be allowed on any money judgment in a civil case recovered in a district court. ...Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield as published by the Board of Governors of the Federal Reserve System for the calendar week preceding the date of the judgment.

## B. Discussion

The parties do not dispute plaintiff's entitlement to pre-judgment interest. They differ on the method of calculation. Plaintiff proposes using the rate of interest set forth in 26 U.S.C. § 6621 which is the rate the Internal Revenue Services (IRS) uses to calculate interest on over-payment and under-payment of taxes and which is periodically adjusted by the Secretary of the Treasury to reflect current economic conditions. Plaintiff compounds the quarterly interest and calculates she is entitled to $23,549.96 in pre-judgment interest.

Defendant proposes using 28 U.S.C. § 1961 and has attached a chart showing the weekly average 1-year constant maturity Treasury yield rates. Ex. C and a spreadsheet, Ex. D, to its opposition (Doc. 138) to plaintiff's Motion which shows its calculations.

The court finds that at the time she was terminated plaintiff's annual salary was $61,700. She made $5,142 a month.[7] She was terminated on January 30, 2008 and there was no evidence adduced that she did not receive her monthly salary for the month of January. Her back pay period began in February, 2008. Judgment was entered in early February, 2011. Her final full month of the back pay period was January, 2011. Thus the back pay period consisted of three years or thirty-six months. The court has examined Exhibits C and D to defendant's Opposition (Doc. 138) and finds that defendant accurately calculated plaintiff's prejudgment interest at $3,209.76.

## C. Applicable Law Concerning Reinstatement

The FMLA provides if there has been a violation of the Act that in addition to damages and interest thereon the employee may be entitled to "such equitable relief as may be appropriate, including employment, reinstatement and promotion." 29 U.S.C. § 2617(a)(1)(B).

In determining whether to award reinstatement, the Eighth Circuit considers the following factors: (1) whether the employer is still in business, (2) whether there is a comparable position available for the employee to assume, (3) whether an

---

[7]      The parties agree on these figures.

innocent employee would be displaced by reinstatement, (4) whether the parties agree that reinstatement is a viable remedy, (5) whether the degree of hostility or animosity between the parties -- caused not only by the underlying offense but also by the litigation process -- would undermine reinstatement, (6) whether reinstatement would arouse hostility in the workplace, (7) whether the employee has since acquired similar work, (8) whether the employee's career goals have changed since the unlawful termination, and (9) whether the employee has the ability to return to work for the defendant employer - - including consideration of the effect of the adverse employment action on the employee's self worth. Ogden v. Wax Works, Inc., 29 F. Supp. 2d 1003, 1010 (N.D. IA. 1998), aff'd., 214 F.3d 999 (8th Cir. 2000).

Reinstatement is often characterized as the "preferred" remedy in unlawful termination cases. However, the wisdom of this judicially-created preference for reinstatement over front pay has been challenged. See Ogden, 29 F.Supp.2d at 1008 and the analysis by Professor Susan K. Grebeldinger in her article entitled *The Role of Work Place Hostility in Determining Prospective Remedies for Employment Discrimination: A Call for Greater Judicial Discretion in Awarding Front Pay*, 1996 U.ILL.L.REV.319 (1996).

> Professor Grebeldinger cogently observes, *inter alia*, that reinstatement "does not always serve the interest of the victims of discrimination, the employers, or society." Id. at 320. Although she recognizes that reinstatement "can be a powerful remedial tool," Professor Grebeldinger emphasizes that front pay can serve the same remedial functions and may better serve to make a plaintiff whole in a given case. Id. at 362. She concludes her critique with the following observations:

> [C]ourts should abandon the reinstatement preference and determine the appropriate prospective remedy case by case.
>
> And, in doing so, they must pay greater attention to the hostility exhibited by one or both parties. Essentially, the court should forego their tradition of preferring reinstatement and adopt the older and more powerful tradition of using their full equitable discretion in assessing remedies.

Ogden, 29 F.Supp.2d at 1008.

The Ogden court does an extensive analysis of the factors to be considered in ordering reinstatement, chief among them, hostility or animosity between the parties. See Ogden, 29 F.Supp.2d at 1008-1010. The list of factors

> is not intended to provide a uniform litany of pertinent considerations. Indeed compilation of such a list is impracticable given the fact-intensive nature of the reinstatement inquiry.... Although these factors are traditionally considered by courts in ascertaining whether reinstatement is an appropriate remedy, the trial court must take care to fashion any equitable relief to the circumstances of the case at hand.

Ogden, 29 F.Supp.2d at 1010 (citation omitted)

## D.    Discussion of Reinstatement

Defendant first argues that plaintiff has waived her request for reinstatement by raising it for the first time in a Motion to Alter or Amend the Judgment (citing Moysis v. DTG Datanet, 278 F.3d 819, 829 (8th Cir. 2002)) (plaintiff waived issue of front pay by raising it for the first time on appeal). However, in plaintiff's Second Amended Complaint, plaintiff's prayer for relief included ". . .any and all further relief as to this court seems just and proper under the circumstances." The court

finds that this contemplates equitable relief and that plaintiff did not waive her request for reinstatement.

Although she stated in her deposition that she was not interested in reinstatement[8] she now apparently seeks it. However, applying the <u>Ogden</u> factors, the court finds that reinstatement would not be appropriate.

Defendant clearly is still in business. The position of Production Supervisor, the position plaintiff previously held, is one that is necessary to defendant's operation. Therefore, it is likely her position has been filled and thus she would displace an innocent employee if she were reinstated. The parties do not agree that reinstatement would be a viable remedy - - defendant vehemently opposes it. Plaintiff has been unable to acquire similar work and her career goals have not changed since the termination. With regard to the factor of the effect of the dismissal of plaintiff's self-worth, the court finds that plaintiff's testimony was painfully eloquent on how the dismissal has effected her, including but not limited to her embarrassment when she sees old friends in the grocery store.

The most frequently cited factors in analyzing whether plaintiff should be reinstated are the degree of hostility or animosity between the parties caused not only by the underlying offense but also by the litigation process and whether reinstatement would arouse hostility in the work place. In the present case, reinstatement would not serve the interest of either plaintiff or defendant.

---

[8] During plaintiff's deposition the following exchange took place: Q: Are you asking for reinstatement? A: No thank you. <u>See</u> Exhibit A to Doc. 138 at p. 243.

Reinstatement would be ill-advised because of the strained, if not totally hostile relationship of the parties. The obvious tension between plaintiff and Sandy Cook, who is still the cold end manager at the Pevely plant, as well as others who were involved in defendant's dismissal, makes it unlikely that plaintiff could be a successful employee. Plaintiff herself testified as to her unhappiness with her working conditions even before her dismissal. The court finds that there is irreparable animosity between the parties and that reinstatement would cause discord and antagonism. See Ogden, 29 F. Supp.2d at 1008-1010 and cases cited therein.

### E. Applicable Law Concerning Front Pay

"If the court concludes that reinstatement is an inappropriate form of prospective relief, it may still elect to award the equitable remedy of front pay. Ogden, 29 F. Supp.2d at 1010 (citing Denesha v. Farmers Ins. Exch., 161 F.3d 491, 501 (8th Cir. 1998)). Although front pay is not specifically provided for as a form of relief under the FMLA, the Eighth Circuit has endorsed the use of front pay as an alternative form of equitable relief when reinstatement is inappropriate. Denesha, 161 F.3d at 501. The Eighth Circuit has recognized that front pay is not so much a monetary award for the salary the employee would have received but for the discrimination but rather the monetary equivalent of reinstatement. Kramer v. Logan County School District No. 1, 157 F.3d 620, 626 (8th Cir. 1998).

Factors to be considered in making an award of front pay include: (1) the plaintiff's age, (2) the length of time plaintiff was employed by the defendant

employer, (3) the likelihood the employment would have continued absent the discrimination, (4) the length of time it will take plaintiff, using reasonable effort, to secure comparable employment, (5) the plaintiff's work and life expectancy, (6) the plaintiff's status as an at-will-employee, (7) the length of time other employees typically held the position lost, (8) the plaintiff's ability to work, (9) the plaintiff's ability to work for the defendant-employer, (10) the employee's efforts to mitigate damages, and (11) the amount of any liquidated or punitive damage award made to the plaintiff. **Ogden**, 29 F. Supp. 2d at 1015.

**F.    Discussion of Front Pay**

Plaintiff requests the court to award her five years of front pay at $61,700 per year, her salary in 2007, her last full year of employment before her termination. ($61,700 x 5= $308,500).  Applying the **Ogden** factors, plaintiff is 46 and states in her brief she would normally work until age 65.  She worked for Saint-Gobain for one and one-half years and has 20+ years of working experience as a manufacturing Production Supervisor.  The likelihood of her continuing at Saint-Gobain absent the discrimination is doubtful because defendant's evidence was persuasive that plaintiff was simply not performing up to expectations.  She was unfamiliar with the glass making process and her supervisors did not believe she was improving.   It is reasonable to assume that her termination was inevitable.  Plaintiff has tried for approximately three years to secure comparable employment however has only been able to obtain two part-time minimum wage-type jobs.   When she applies for comparable employment and the prospective employer learns she was fired from

Saint-Gobain, the employer loses interest immediately. It is reasonable to conclude that plaintiff will be unable to secure comparable employment. Plaintiff was an at-will employee at Saint-Gobain and could be fired for any reason or no reason with or without notice as long as the reason was not prohibited by law. Other employees and shift supervisors at Saint-Gobain are long-term employees: Jeff Terveer who, like plaintiff, had no prior glass making experience, lasted an even shorter period of time than plaintiff did. Although plaintiff is able to work, her ability to work at Saint-Gobain - - given her tensions with Sandy Cook and other supervisory personnel - - is unlikely. The court finds that plaintiff has attempted to mitigate her damages but for reasons discussed above she has been unsuccessful finding comparable employment. Because plaintiff has been awarded in excess of $200,000 in liquidated damages, any amount of front pay should be considered in that light.

The <u>Ogden</u> factors cut both ways. The calculation of front pay, which is necessarily uncertain, is a matter of equitable relief within the court's discretion. <u>Hukkamen v. International Union of Operating Engineers</u>, 3 F.3d 281, 286 (8th Cir. 1993). The court is mindful that front pay should not result in a windfall to plaintiff. <u>Standley v. Chilhowee R-IV Sch. Dist.</u>, 5 F.3d 319, 322 (8th Cir. 1993). It is significant that plaintiff only worked at Saint-Gobain for 1.5 years and her previous work history indicates that she was never a long-term employee anywhere. She voluntarily terminated her employment immediately prior to Saint-Gobain after one year. Her longest employment since 1993 was two years and three months. Plaintiff cites cases in which five years of front pay have been approved; defendant cites cases

in which an award of five years front pay was rejected. The court has reviewed all of the cases cited by both parties and concludes that an award of one year of front pay is equitable ($61,700).

**IV. PLAINTIFF'S MOTION FOR ATTORNEYS FEES [Docs. 126, 130]; DEFENDANT RESPONDED IN OPPOSITION [Doc. 139]; PLAINTIFF REPLIED [Doc. 151]; DEFENDANT SURREPLIED [Doc. 154]**

**A. Applicable Law Concerning Attorney's Fees**

The FMLA provides that the court "shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees and other costs of the action to be paid by the defendant." 29 U.S.C. § 2617(a)(3).

In determining what fees, if any, to award a plaintiff in a civil rights action, a court must first decide whether plaintiff is a "prevailing party"; that is, whether he achieved through litigation some of the benefit originally sought in bringing the suit. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); if the court answers this question in the affirmative, it should then determine what attorney's fees are reasonable under the circumstances. Hensley, 461 U.S. at 438-40. Here the parties do not dispute that plaintiff is the prevailing party on one of her five claims. Thus the court turns to the issue of what attorney's fees are reasonable.

The Eighth Circuit has adopted guidelines for attorney's fees similar to those set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974), in which the court listed twelve factors to be considered in determining a

reasonable attorney's fee.[9] Thorne v. Welk Investment, Inc., 197 F.3d 1205, 1213 (8th Cir. 1999) (citing St. Louis Fire Fighters Ass'n., 96 F.3d at 332 n.10.)  These twelve factors, however, are to be applied more as considerations for adjustment upward or downward, after an initial calculation of the product of the reasonable hours multiplied by a reasonable rate.  The factors are usually subsumed in that inquiry.  Hensley, 461 U.S. at 434 n.9.  "A reasonable [attorney's] fee is 'one that is adequate to attract competent counsel, but. . . [that does] not provide windfalls to attorneys.'"  McDonald v. Armontrout, 860 F.2d 1456, 1458 (8th Cir. 1988) (quoting Blum v. Stenson, 465 U.S. 886, 897 (1984)).  This requires a two-part analysis which involves, first, determining the reasonable hourly rate and second, the number of hours reasonably expended.  This is known as the "lodestar amount."  Thus, "in determining attorney fees, the district court should ordinarily award the number of hours claimed multiplied by the attorney's regular hourly rate.  Hensley, 461 U.S. at 434 n.9.  If however, the district court finds that a lesser amount is appropriate, it

---

[9]     The twelve factors are:
(1) the time and labor required, (2) the novelty and difficulty of the question, (3) the skill requisite to perform the legal services properly, (4) the preclusion of other employment due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client and (12) awards in similar cases.

St. Louis Fire Fighters Ass'n. v. St. Louis, Missouri, 96 F.3d 323, 332 n.10 (8th Cir. 1996).

may reduce the award, provided that the court states its reasons for so doing.  See e.g., St. Louis Fire Fighters, 96 F.3d at 332.

In addition, because fees should not be awarded for services performed on an unsuccessful claim, the court must also consider whether and to what extent the claims for relief involve a "common core of facts" or are based on "related legal theories" such that they are inextricably linked.  Hensley, 461 U.S. at 434-35.  Where successful and unsuccessful claims are so intertwined, it is difficult for the court to allocate the fees appropriately.  Id.  Courts should therefore consider the relationship between successful and unsuccessful claims.  See Lash v. Hollis, 525 F.3d 636, 643 (8th Cir. 2008).  There is no precise rule or formula for the allocation of fees for successful and unsuccessful claims.  "A district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success."  Parton v. GTE North, Inc., 971 F.2d 150, 156 (8th Cir. 1992) (quoting Hensley, 461 U.S. at 436-437).

B.    Discussion

In determining the Hensley two-part analysis, plaintiff's attorney has claimed an hourly rate of $350 based on comparable rates charged by her contemporaries in the field who also graduated from Washington University Law School in 1993.[10]  She claims that her hourly rate is "reasonable and consistent with attorneys of comparable skill, reputation and expertise performing similar work in the St. Louis

---

[10]    She claims an hourly rate of $100 when she performed paralegal duties.

area." Plaintiff's Memorandum in Support of her Motion, Doc. 130 at p.7. Defendant does not dispute or challenge plaintiff's hourly rate for legal or paralegal work.

Plaintiff's attorney has attached a detailed accounting in chronological order of the date the work was done, the nature of the work performed and the time required to perform the work. See plaintiff's attorney's Memorandum in Support of her Motion, Doc. 130, Ex.1, Attachment. She claims the hours expended in her legal capacity total 618.1; in her paralegal capacity, the hours total 20.1.

Defendant challenges the number of hours reasonably expended. Hensley, 461 U.S. at 434 n.9. Defendant argues that the court can perform a line item reduction on plaintiff's attorney's claimed fee or "simply reduce the award to account for the limited success" as suggested in Hensley, 461 U.S. at 436-37. Defendant considers the latter, the percentage-based reduction, to be the most equitable. The court agrees that this method of calculation is preferable.

Plaintiff originally brought five claims against defendant. Of those five counts, one (retaliation in violation of the MHRA) was dismissed early in the litigation as a result of defendant's Motion to Dismiss that claim. Two other counts (unlawful termination in violation of the FMLA in 2007 and age discrimination under the MHRA) were resolved in defendant's favor as a result of defendant's Motion for Summary Judgment. Plaintiff's two remaining claims (MHRA gender discrimination claim and 2008 FMLA claim) proceeded to a one week jury trial in January of 2011. Of those two claims, plaintiff prevailed on the 2008 FMLA count only. Plaintiff argues vehemently that the five claims were inextricably related. She describes at

length the hard-fought nature of the litigation and the numerous motions vigorously litigated and endless discovery disputes.  See plaintiff's attorney's Memorandum in Support of her Motion, Doc. 130 at p.9-11.

Defendant, on the other hand, argues a detailed and painstaking recital of the reasons why plaintiff's claims were unrelated both factually and legally.  Defendant argues that based on its analysis of deposition transcripts, dispositive motions and the entire trial transcript and after literally counting the number of lines in each devoted to plaintiff's 2008 FMLA claim, plaintiff's attorney's fees should be adjusted downward by 70%.  Defendant acknowledges that in some instances more time and effort may have been devoted to plaintiff's 2008 FMLA claim than 30% but points that in just as many instances, far less than 30% was devoted to the 2008 FMLA claim.  The average of all the instances reviewed results in defendant's conclusion that only 30% of plaintiff's attorney's time and energy was spent pursuing her 2008 FMLA claim or the litigation in general.[11]

The court notes that of plaintiff's original five claims, only two went to trial and plaintiff prevailed on only one claim.  On that one claim all she had to prove was that plaintiff notified defendant of her intent to take FMLA leave, that defendant terminated plaintiff and that plaintiff's notifying defendant of her intention to take FMLA leave was a determining factor in defendant's decision to terminate her.

---

[11]     Defendant uses the term "litigation in general" or the "litigation generally" to refer to certain facts about plaintiff, her employment and her termination which are facts which plaintiff would have needed to present regardless of which claims she brought or prevailed upon against defendant.

Plaintiff's only evidence that she told Sandy Cook that she would need to take FMLA leave soon was her own assertion that she did in fact notify Ms. Cook. Defendant argues that plaintiff's assertion and the temporal proximity between the notice and the termination are the only evidence on this issue.

However, defendant overlooks the reasons defendant told plaintiff she was being fired and plaintiff's relentless and extensive evidence that co-workers did the same things and were not fired. Although there was no evidence whether or not the co-workers asked for FMLA leave, it is plaintiff's contention that the only difference was that they did not ask for FMLA leave. The other obvious difference is that the co-workers were male. That fact goes to her gender claim. Relevant here is that co-workers who apparently did not request FMLA leave were not fired. Admissible evidence is evidence that the jury may use as they see fit absent an instruction that the evidence is being admitted for a limited purpose. <u>See</u> Eighth Circuit Model Jury Instructions (Civil) 1.02. No request for such a limiting instruction was made.

The court therefore finds that defendant's position that the requested attorney's fees should be reduced by 70% is excessive. The court has recalculated defendant's line count analysis for the percentage reduction as well as the law set out above. The court has also considered the twelve factors adopted by the Eighth Circuit for determining whether to augment or reduce attorney's fees. The court finds that the amount of time and labor required to prosecute this case was extraordinary. Great skill was necessary to perform the legal services properly. Because plaintiff's attorney is a solo practitioner, the amount of time expended did

preclude other employment. The hourly rate she has requested is customary and was a contingent fee. The experience, reputation and ability of the attorneys on both sides is unquestioned. Both parties did an extraordinary job of explaining the procedures used in the glass manufacturing business and probably could run Saint-Gobain's plant by themselves if required to do so. Having reviewed all these factors, the court finds that a 50% reduction is appropriate. Plaintiff has requested $218,345. ($216,335 of this amount is for attorney work and $2,010 is for paralegal work) A 50% reduction amounts to an award of $109,173.

V.   **PLAINTIFF'S MOTION FOR COSTS AND BILL OF COSTS [Docs. 127, 130]; DEFENDANT RESPONDED IN OPPOSITION [Doc. 137]; PLAINTIFF REPLIED [Doc. 149]; DEFENDANT SURREPLIED [Doc. 155]**

A.     **Applicable Law Concerning Costs**

The FMLA specifically provides that the court "shall, in addition to any judgment awarded to the plaintiff allow a reasonable attorney's fee, reasonable expert witness fees and other costs of the action to be paid by the defendant." 29 U.S.C. § 2617(a)(3).

Fed.R.Civ.P. 54(d)(1) provides, in relevant part, that "[u]nless a federal statute, these rules or a court order provides otherwise, costs - - other than attorney's fees - - should be allowed to the prevailing party." This provision codifies the presumption that the prevailing party is entitled to costs. <u>Greaser v. State Dep't. of Corrections</u>, 145 F.3d 979, 985 (8th Cir. 1998) (citing <u>Bathke v. Casey's Gen. Stores, Inc.</u>, 64 F.3d 340, 347 (8th Cir. 1995)).

Further, 28 U.S.C. § 1920 states[12]:

A judge or clerk of any court of the United States may tax as costs the following:

(1)     Fees of the clerk and marshal;

(2)     Fees for printed or electronically recorded transcript necessarily obtained for use in the case;

(3)     Fees and disbursement for printing and witnesses;

(4)     Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5)     Docket fees under section 1923 of this title;

(6)     Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

"In <u>Crawford Fitting Co. v. J. T. Gibbons, Inc.</u>, 482 U.S. 437 (1987) the Supreme Court found that the word 'costs' in Rule 54(d) must be read in harmony with the word 'costs' in §1920." <u>Emmenegger v. Bull Moose Tube Co.</u>, 33 F. Supp. 2d 1127, 1132 (E.D.Mo. 1998). The court has no reason to believe that the same is not true with regard to the word "costs" in the FMLA 29 U.S.C. § 2617(a)(c). <u>See Murphy v. FedEx National LTL, Inc.</u>, 2009 WL 1939957 n.9 at *3 (E.D. Mo. 2000) (using 29

_____

[12]     The form provided and required by the Eastern District of Missouri for submission of a bill of costs states the §1920 requirements in slightly different verbiage but with the same substantive elements.

U.S.C. § 2617(a)(3) to allow plaintiff to recover costs but applying §1920 to determine what costs were allowable).

## B. Discussion

Defendant begins its objections by pointing out that the court's Judgment entered February 8, 2011 specified that "each party shall bear its own costs." The court acknowledges that this was an error because the of FMLA's mandatory award of costs to the prevailing party. It was mistakenly included because it is frequently standard language in a judgment. The Judgment will be vacated and an amended Judgment entered.

Defendant next complains that because of this error defendant did not submit a Bill of Costs as prevailing party on the MHRA gender discrimination count. Def.'s Response, Doc. 137 at p.4. Defendant has however, repeatedly throughout this litigation made clear its ability to raise issues with which it disagrees with the court. Defendant could have filed - - immediately after entry of the Judgment - - a motion to amend and to allow defendant to file a bill of costs. Defendant has waived this point. In addition, it is to be noted that an award of costs to prevailing defendants in a civil rights case would have a chilling effect on potential plaintiffs.

Defendant then argues that plaintiff's Motion for Costs and Bill of Costs should be denied as to costs that are not associated with or inextricably linked to the claim upon which she prevailed or should be denied as costs not awardable under §1920.

First, examining items not authorized by §1920:

(1) $660 paid to mediator Jerome Diekemper for court ordered mediation.

The Eighth Circuit has held that 28 U.S.C. § 1920 does not include the mediation fee as a taxable cost. Brisco-Wade v. Carnahan, 297 F.3d 781, 782 (8th Cir. 2002) (holding the district court abused its discretion in taxing mediator's fee). Plaintiff points out that she was permitted to proceed *in forma pauperis* and thus should not have to pay the mediator's fee. There is a provision in the local rules for a person who demonstrates an inability to pay to request the court to appoint a neutral who has agreed to serve *pro bono*. No such request was made. Therefore, $660 will be disallowed.

(2) $344 for private process servers.

In this category plaintiff claims $344 for private process servers. She explains the difficulty she encountered serving Charlie Franzoi and defendant's reluctance to make Mr. Franzoi available for deposition. The taxation of costs statute, 28 U.S.C. § 1920 does not provide for the taxation of fees of private process servers, rather, it provides only for the fees of the "clerk and marshal." 28 U.S.C. § 1920(1). A bankruptcy court gave extensive study to case law concerning the taxation of fees for service of subpoenas by private process servers and concluded that in light of the unambiguous language of 28 U.S.C. § 1920, these fees were non-taxable. D&B Countryside, L.L.C. v. Newell (In Re: D&B Countryside, L.L.C.), 217 B.R. 72 (Bkrtcy. E.D. Va. 1998). The Eighth Circuit has clearly taken this position. Crues v. KFC Corp., 768 F.2d 230, 234 (8th Cir. 1985). (28 U.S.C. § 1920 contains no provision for the use of special process servers, thus such costs are non-taxable); Uni-Systems,

Inc. v. Delta Airlines, 2002 WL 505914 at *2 (D.Minn.)) (same); United States Ex Rel Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp., 95 F.3d 153, 172 (2nd Cir. 1996) (same); Cofield & Krumpler, 179 F.R.D. 510, 515 (E.D. Va. 1998) (same).

Although the "modern trend" is to permit the recovery of private process server fees, Crues is controlling in the Eighth Circuit and the court must deny the private process service costs in this case. See, American Family Mut. Ins.Co. v. Miell, 569 F. Supp. 2d 841, 860 (N.D. Iowa 2008); see also Bunda v. Potter, 2006 WL 266513 (N.D. Iowa) ("...while other courts have permitted the recovery of special process fees, this court is compelled to follow Eighth Circuit precedent regardless of the equities at play in the facts of this case.").

Some courts, particularly the Ninth Circuit and several district courts, have allowed as costs, fees for service of subpoenas for special process servers because the United States Marshals Service no longer serves summons or subpoenas in most civil cases.[13]  See Cofield, 179 F.R.D. at 515 and numerous cases cited therein. Nevertheless, this court takes the position of the Cofield court and the Bankruptcy Court in Newell: "There is no obvious policy reason why private process server fees should not be recoverable, and it may simply be that Congress has not focused on the

---

[13]     Rule 45 of the Federal Rule of Civil Procedure was amended in 1991 to limit the United States Marshal's duties in serving trial subpoenas. Congress has not amended the taxation-of-costs statutes in the years since Rule 45 was amended. This delay could suggest an intention by Congress to leave the statute unchanged, Cofield, 179 F.R.D. at 516 n.6, or it could be interpreted as merely an oversight to do so.

need to amend §1920 or to take account of the fact that United States Marshals no longer serve subpoenas in civil case." <u>Newell</u>, 217 B.R. at 76-77. "If this is the case, Congress is free to amend the statute, but it is not the function of this court to rewrite the statute. It is the court's duty to apply the statute as written." <u>Cofield</u>, 179 F.R.D. at 516. Therefore, the private process server fee of $344 will not be allowed.

(3)      <u>$200 for attendance fees and mileage fees.</u>

Charlie Franzoi was not deposed; Jeff Terveer, Kim White and Angela Steward did not testify. Plaintiff has charged $50 for each of these persons. The attendance fee and mileage fee for Charlie Franzoi will be allowed. The other three charges will be disallowed.

(4)      <u>$595.21 for exemplification and copies of papers necessarily obtained for use in the case.</u>

The $416.53 for copying and binders for trial exhibits will be allowed. The court finds that these items did ease the witnesses' testimony and enhance "[t]he smooth delivery of the trial to the jury." <u>See</u> Plaintiff's Memorandum in Support of her Motion, Doc. 130 at p.12. The court's document display system, while undoubtedly useful for displaying documents to the jury, is sometimes not adequate for the witness to read effectively. These binders were therefore necessarily obtained for use in the case.

The $108.49 for blowups/mounted exhibits will be allowed. They greatly facilitated the comparison of several documents one to another which the court's document display system cannot efficiently do. They were therefore necessarily obtained for use in the case.

The $10.49 for providing a courtesy copy to the court will be allowed. Although usually expenses incurred in copying one's own pleadings and motions for filing in the court are not allowed, see Emmenegger, 33 F. Supp. 2d at 1133, in this case the court's Case Management Order specifically requested a courtesy copy. It was therefore necessarily obtained for use in the case.

(5)      Mailings of $11.60 and $6.80 to the client.

§1920 does not allow postage as a taxable cost. See Hollenbeck v. Falstaff Brewing Co., 605 F. Supp. 421, 439 (E.D. Mo. 1985). These amounts will be disallowed.

As to the costs which defendant alleges were not associated with claims on which plaintiff prevailed, the court has reviewed each of the challenged costs (some of which are duplicative of costs which defendant argues should not be awarded under §1920) and finds that they are not so far removed from plaintiff's FMLA claim to be considered "not associated with." Therefore of plaintiff's requested $3,421.43, the court will disallow the following:

$660 mediator
$344 special process server
$11.60 mailing to client
$6.80 mailing to client
$150 attendance fees

$3,421.43 - $1,172.40 = $2,249.03. Therefore, costs of $2,249.03 will be allowed.

Accordingly,

IT IS HEREBY ORDERED that defendant's Motion for Judgment as a Matter of Law is GRANTED in part and DENIED in part. [Doc. 132] It is DENIED

with regard to the Motion for Judgment as Matter of Law [Doc. 132-1] and **GRANTED** with regard to the request for a written opinion [Doc. 132-2] and **DENIED** as to defendant's request that liquidated damages not be allowed. [Doc. 132-3]

 **IT IS FURTHER ORDERED** that plaintiff's Motion for Prejudgment Interest and Reinstatement or, in the Alternative, Front Pay is **GRANTED** in part and **DENIED** in part. [Doc. 135] It is **GRANTED** to the extent that prejudgment interest will be awarded in the amount of $3,209 [Doc. 135-1] and **DENIED** with regard to the request for reinstatement [Doc. 135-2] and **GRANTED** to the extent that front pay will be awarded for one year in the amount of $61,700. [Doc. 135-3].

 **IT IS FURTHER ORDERED** that plaintiff's Motion for Attorney's Fees is **GRANTED** in part and **DENIED** in part. [Doc. 126] It is **GRANTED** to the extent that attorney's fees are awarded in the amount of $109,173 [Doc. 126-1].

 **IT IS FURTHER ORDERED** that plaintiff's Motion for Costs and Bill of Costs is **GRANTED** in part and **DENIED** in part. [Doc. 127] It is **GRANTED** to the extent that plaintiff is awarded costs in the amount of $2,249.03.

 **IT IS FURTHER ORDERED** that an Amended Judgment will be entered contemporaneously herewith which will reflect the following:

| | |
|---|---|
| $206,500 | **Damages** |
| $3,209 | **Prejudgment Interest** |
| $209,709 | **Liquidated Damages** <br> **($206,500 + $3,209 = $209,709)** |
| $61,700 | **Front Pay** |

|  | $109,173 | Attorney's Fees |
|--------|-----------|-----------------|
|  | $2,249.03 | Costs |
| TOTAL | $592,540.03 | |

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this __18th__ day of May, 2011.